**Joseph E. COWDIN, D.V.M., et al.**

v.

**Frank E. YOUNG, M.D., et al.**

**Civ. A. No. 87–0912.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

Nov. 30, 1987.

Robert G. Pugh, Sr., Pugh & Pugh, Shreveport, La., James R. Phelps and Robert Dormer, Hyman, Phelps & McMamara, Washington, D.C., for plaintiffs.

Joseph S. Cage Jr., U.S. Atty., David A. Titman, Asst. U.S. Atty., Dept. of Justice, Shreveport, La., Jacqueline H. Eagle, John R. Fleder, Office of Consumer Litigation,

Civ. Div., U.S. Dept. of Justice, Washington, D.C., Thomas Scarlett, Chief Counsel, Richard G. Geyer, Associate Chief Counsel, Food & Drug Admin., Rockville, Md., for defendants.

Philip C. Olsson, David F. Weeda, Arthur Y. Tsien, Olsson, Frank & Weeda, Washington, D.C., for amicus curiae.

## MEMORANDUM RULING

STAGG, Chief Judge.

Plaintiffs, a group of 36 veterinarians and the American Food Animal Veterinary Medical Association, filed this action seeking declaratory and injunctive relief to prevent defendants, Frank E. Young, M.D., and Gerald B. Guest, both of the Food and Drug Administration (hereinafter "FDA") from pursuing an enforcement policy (hereinafter referred to as the extra-label use policy) that seeks to prohibit veterinarians from using drugs in a manner other than that determined by labeling which has received approval from the FDA. Presently before the court is defendants' motion to dismiss plaintiffs' complaint on the basis that no final agency action has occurred, the case is not ripe for adjudication and does not present a case or controversy, and that plaintiffs lack standing to bring the action. For reasons stated more fully hereinafter, the court concludes that the issues presented by plaintiffs' complaint are not yet ripe for adjudication and, in any event, plaintiffs lack standing.

## ANALYSIS OF LAW AND FACTS

■ The doctrine of ripeness requires a court to evaluate both the fitness of the issues for judicial decision and the hardship to the parties by withholding court consideration. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In making this inquiry, four factors are relevant: (1) whether the issues presented are purely legal; (2) whether the challenged agency action constitutes "final agency action" within the meaning of the Administrative Procedure Act (hereinafter "APA"); (3) whether the impact of the agency action on plaintiffs is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage; and (4) whether resolution of the issues will foster, rather than impede, effective enforcement and administration by the agency. *Id.* 387 U.S. at 149-54, 87 S.Ct. at 1515-1518; *see also, State of Texas v. United States Department of Energy*, 764 F.2d 278, 283 (5th Cir.1985).

■ Plaintiffs challenge the FDA's action in formulating Compliance Policy Guide (hereinafter "CPG") No. 7125.06 dated March 9, 1984, as amended on November 1, 1986, wherein it is stated that the extra-label use [1] of new animal drugs in food producing animals by veterinarians will be subject to regulatory action.[2] Yet, the CPG expressly provides that extra-label drug use in treating food producing animals "may be considered by a veterinarian when the health of animals is immediately threatened and suffering or death would result for failure to treat the affected animals."[3] The CPG concludes by outlining

1. The CPG defines "extra-label use" as:
   [T]he actual or intended use of a new animal drug in a food-producing animal in a manner that is not in accordance with the drug labeling. This includes, but is not limited to, use and species or for indications (disease or other conditions) not listed in the labeling, use at dosage levels higher than those stated in the labeling, and failure to observe the stated withdrawal time.

2. The CPG was precipitated due to concern about the extra-label use of drugs in livestock and the possibility that human food might become adulterated with illegal drug residues form extra-label misuse.

3. The CPG goes on to provide that regulatory action in instances of this nature would not

ordinarily be considered if certain criteria are met, including:

1. A careful medical diagnosis is made by an attending veterinarian within the context of a valid veterinarian-client-patient relationship;

2. A determination is made that (a) there is no marketed drug specifically labeled to treat the condition diagnosed, or (b) drug therapy at the dosage recommended by the labeling has been found clinically ineffective in the animals to be treated;

3. Procedures are instituted to assure that identity of the treated animals is carefully maintained; and

4. Significantly extended time period is assigned for drug withdrawal prior to marketing meat, milk or eggs; steps are taken to

the instances of extra-label use for which regulatory attention may be appropriate.[4] The statutory basis upon which the CPG is based, 21 U.S.C. § 360b, provides, insofar as pertinent:

> (a)(1) A new animal drug shall, with respect to any particular use or intended use of such drug, be deemed unsafe for the purposes of section 351(a)(5) and section 342(a)(2)(D) of this title unless—
>
> > (A) there is in effect an approval of an application filed pursuant to subsection (b) of this section with respect to such use or intended use of such drug,
> >
> > (B) such drug, its labeling, and such use conform to such approved application, and
> >
> > (C) in the case of a new animal drug subject to subsection (n) of this section and not exempted therefrom by regulations it is from a batch with respect to which a certificate or release issued pursuant to subsection (n) is in effect with respect to such drug.

Plaintiffs challenge the CPG, arguing that Congress intended to exempt veterinarians from the reach of 21 U.S.C. § 360b. Plaintiffs concede, as they must, that the language of § 360b contains no exemption for veterinarians. Assuming, *arguendo*, that the issues presented in plaintiffs' suit are purely legal and that the CPG constitutes final agency action for purposes of judicial review under the APA, the action is not ripe under the remaining factors considered relevant by the Court in *Abbott Laboratories, supra.*

In an effort to demonstrate that the CPG will have a direct and immediate impact upon plaintiffs, the court has been provided with verified statements from some of the plaintiffs and other veterinarians. Based upon these statements, plaintiffs argue that the CPG constitutes an unauthorized intrusion in the day-to-day practice of veterinarians. The verified statements, how-

ever, do not support this conclusion. To the contrary, the statements reveal that the CPG has had little to no impact upon plaintiffs' day-to-day activities.

The statements go into considerable detail, giving examples, about the necessity of extra-label drug use in the treatment of food producing animals. The veterinarians do not state, though, that the CPG has changed the way in which they provide treatment. Indeed, Dr. Daniel J. Lohnes states that "extra-label use of drugs is a very important ingredient in my practice and its exclusion would make the effective practice of veterinary medicine impossible." Similarly, Dr. Wiley R. McVicker attests that, "the use of drugs extra-label is a common occurrence and is a legitimate part of my practice." No plaintiff has alleged that the FDA's policy has caused any change in his practice since its inception over three years ago.

Plaintiffs further argue, nonetheless, that the CPG forces veterinarians to choose between complying with ethical rules of their profession or FDA-stated policy. Though it is admitted by Dr. Guest that literal compliance with the CPG may be inconsistent with ethical practices of veterinary medicine, plaintiffs' argument is seriously flawed. Specifically, the FDA's CPG has no binding legal effect upon plaintiffs, thereby leaving them free to follow ethical principles. According to 21 C.F.R. § 10.90(b)(1), the CPG merely provides "procedures or standards of general applicability that are not legal requirements but are acceptable to FDA for subject matter which falls within the laws administered by the Commissioner." The next subsection emphasizes this point:

> A person may rely upon a guideline with assurance that it is acceptable to FDA, or may follow different procedures or standards. When different procedures

---

assure that the assigned time frames are met, and no illegal residues occur.

**4.** In order of priority, these instances include: (1) cases where illegal residues occur [in meat, milk or eggs]; (2) use of chloramphenicol or diethylstilbestrol (DES) in food animals; (3) use of dimetridazole, ipronidazole or other nitroimi-

dazoles in unapproved species such as swine; (4) manufacturers and distributors who promote extra-label use of drugs; (5) the mixing of drugs in the medicated feeds intended for extra-label use; (6) extra-label use by laymen at their own initiative.

or standards are chosen, a person may, but is not required to, discuss the matter in advance with FDA to prevent the expenditure of money and effort on activity that later may be determined to be unacceptable. 21 C.F.R. § 1090(b)(1)(i). Paragraph 8 of the same subdivision further provides that "a guideline may be used at administrative court proceedings to illustrate acceptable and unacceptable procedures or standards, but not as a legal requirement." Accordingly, the plaintiffs are not faced with a situation in which a binding legal requirement precludes them from practicing their profession within ethical boundaries.

More noteworthy, however, is the fact that not a single plaintiff is presently the subject of an enforcement action under 21 U.S.C. § 360b.[5] This factor becomes significant under *Abbott Laboratories, supra,* to support two conclusions: (1) that the challenged action does not nor will have a direct and immediate impact on plaintiffs; and (2) that judicial resolution of the issues would impede rather than foster effective enforcement administration by the FDA. 387 U.S. at 152–54, 87 S.Ct. at 1517–1518. The significance of these conclusions is amplified by the fact that the FDA will not recommend prosecution to the United States Attorney's Office without first providing the alleged violator with notice and opportunity to be heard.[6]

Pursuant to 21 C.F.R. § 7.84(a)(1), an individual against whom criminal prosecution is contemplated for a violation of the Federal Food, Drug and Cosmetic Act "shall be given appropriate notice and opportunity to present information and views to show cause why criminal prosecution should not be recommended to the United States Attorney." The notice must specify the time and place where the accused may present his views as well as a summary of the violations that constitute the basis of the contemplated prosecution. *Id.* at Paragraph (d)(2) and (3). The regulations further provide that an accused may have counsel present at a hearing if desired. *Id.* at Paragraph (f). Additionally, an individual may present any information of any kind bearing on the FDA's determination to recommend prosecution including "statements of persons appearing on the [accused's] behalf, letters, documents, laboratory analysis, if applicable, or other relevant information or art arguments." 21 U.S.C. § 7.85(c).

The court's record reveals that only four plaintiffs were sent notices in connection with the extra-label use of new animal drugs. In three instances, the matters were resolved by way of a letter indicating that the use would be discontinued. The fourth instance appears to have been mooted by a letter from the veterinarian's counsel, indicating a voluntary withdrawal of a "medicated feed application" involving the disputed drug. All four instances were, therefore, resolved or mooted prior to the initiation of this action. There is no indication whatsoever that any repercussions presently exist.

In a further effort to show that the CPG has an immediate impact upon plaintiffs, the court's attention is drawn to a letter written by defendant Young. The letter, written to Congressman Ted Weiss, was in response to the congressman's letter to Young expressing concern about the extra-label use of new animal drugs. In the letter, Young merely reiterates the FDA policy as contained in CPG No. 7126.06. Plaintiffs find significant Young's statement to the effect that "a veterinarian who uses a drug in an extra-label manner does so at his own peril." Young's letter, however, was not directed to veterinarians but to a congressman. Nothing in the letter

---

**5.** 21 U.S.C. § 360b provides remedies, civil as well as criminal, for any activity, by any person, which, under the statute, results in the adulteration of an animal drug. *See generally,* 21 U.S.C. §§ 331 (prohibited acts), 332 (injunction proceedings), 333 (criminal penalties), and 334 (seizures).

**6.** Notice and opportunity need not be provided if the commissioner has reason to believe that to do so would result in the alteration or destruction of evidence or in the prospective defendants' flight to avoid prosecution or if the commissioner contemplates recommending further investigation by the Department of Justice. *See,* 21 C.F.R. § 7.84(a)(2) and (3).

indicates that the FDA will change its enforcement practices in any way. As applied to veterinarians, the disputed CPG appears, from the record, to have been relatively dormant since its publication in 1984. Indicative of this fact is the statement in Young's letter to Congressman Weiss that "the FDA cannot, and has not, affirmatively sanctioned any violations of this provision in any circumstances."

Based on the foregoing analysis, the court concludes that plaintiffs' action is not yet ripe for judicial review and must be DISMISSED. Given the circumstances discussed above, the court further concludes that the mere potential for future injury is insufficient to render the issues presented ripe for review. In *Toilet Goods Association v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), the Supreme Court found unfit for review the challenge to a regulation authorizing the FDA to suspend the certification of any person refusing to permit agency inspection. Although the case involved final agency action and presented the purely legal question of statutory authority of the agency, the court declined review because no specific inspections had yet been ordered. *Id.* 387 U.S. at 162–63, 87 S.Ct. 1523–1524. The Court reasoned that no immediate response to the regulation was required of manufacturers, nor would any "irremediable adverse consequences flow" from deferring review until specific inspection had been ordered by the agency and refused by a manufacturer. *Id.* at 164, 87 S.Ct. at 1524. Precisely the same reasoning applies in the case at bar.

■ As indicated, the CPG is not a binding legal requirement under which plaintiffs must comply. *See*, 21 C.F.R. § 10.90(b)(1)(i) and (8). Thus, no immediate response to the CPG is required of veterinarians, nor can this court perceive any "irremediable adverse consequences" that will flow from deferring review until the CPG has been used as a basis for imposing a sanction or initiating criminal prosecution upon a veterinarian.[7]

## STANDING

The term "standing" encompasses a blend of constitutional requirements and prudential considerations. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). Regarding the requirement of standing, the Supreme Court has held that:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' ... and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'

*Valley Forge v. Americans United*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted).

■ The analysis of fact in connection with the ripeness issue makes it abundantly clear that plaintiffs lack standing. Simply stated, there has been no demonstration that plaintiffs have suffered any actual or threatened injury by virtue of the disputed CPG. It follows, therefore, that the two additional standing requirements cannot be established.

Undoubtedly, the issues raised by plaintiffs are of considerable public concern, but, at this point, pose only a broad and generalized complaint. As indicated by the United States Supreme Court, the judiciary is to refrain from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances," pervasively shared and most appropriately addressed in the respective branches of government. *Warth v. Seldin*, 422 U.S. at

---

7. For cases using the same rationale, *see, Dailey v. Mathews*, 536 F.2d 519, 521–22 (2d Cir.1976) (despite doctor's anxiety about an FDA inspection, case challenging FDA's authority to inspect was not ripe where all that physician suffered was possibility of future inspection, even though the FDA had already made one attempt to inspect plaintiff); *Wohler Livestock Company, Inc. v. Harris*, 487 F.Supp. 1, 3 (N.D.Tex.1980) (challenge to FDA's authority to inspect not ripe due to possibility of criminal sanctions despite memo directing specific inspections to take place).

499–500, 95 S.Ct. at 2205–2206. Plaintiffs' only recourse at this stage is through the appropriate legislative channels. At least one association of veterinarians has realized this fact. The statement of Dr. A.F. Hopkins reveals that the AVMA has set up a task force, for which he is chairman, to seek relief through legislation of the FDA's interpretation of the Food, Drug and Cosmetic Act. Dr. Hopkins states that the AVMA has chosen to resolve the matter through legislation rather than litigation. When considering the role of the judiciary in a system founded upon the doctrine of separation of powers, it becomes clear that the AVMA's approach is most appropriate. As the Supreme Court stated:

> The power to declare the rights of individuals and to measure the authority of government ... 'is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy.'

*Valley Forge*, 454 U.S. at 471, 102 S.Ct. at 758, quoting from *Chicago and Grand Trunk R. Company v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892).

Based on the foregoing analysis of authorities and facts, the court holds that plaintiffs' action is not yet ripe and that, in any event, plaintiffs lack standing.

An order consistent with the terms of this memorandum ruling shall issue herewith.

## ORDER

For the reasons assigned in the foregoing memorandum ruling,

IT IS ORDERED that plaintiffs' action be DISMISSED, as the case is not yet ripe for judicial review nor do plaintiffs have standing.