**MEDICAL CENTER PHARMACY,**
**et al. Plaintiffs**

v.

**GONZALES, et al. Defendants**

**No. MO–04–CV–130.**

United States District Court,
W.D. Texas,
Midland–Odessa Division.

Aug. 30, 2006.

*ORDER GRANTING IN PART PLAIN-TIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART ·DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

JUNELL, District Judge.

Before the Court are Plaintiffs' Motion for Summary Judgment, filed March 31, 2006; Defendants' Motion for Summary Judgment, filed March 31, 2006; and numerous responses, replies, and supplemental briefs. On May 25, 2006, the Court held a hearing over the parties' Motions for Summary Judgment. After due consideration, and in accordance with the oral pronouncement made at the hearing, the Court finds the following order shall now enter.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are a group of ten state-licensed pharmacies that specialize in compounding prescription drugs for humans and non-food animals. Although the Food, Drug and Cosmetic Act ("the Act"), 21 U.S.C. § 301, *et seq.*, does not define the terms compounding or compounded drug, the practice has been generally defined as the process by which "a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360–61, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002). These hybrid drugs are typically created in the absence of a commercially available drug which would serve a similar purpose, or where a commercially available drug contains ingredients to which the patient is allergic. The practice of compounding drugs from approved ingredients saves time and money for patients and physicians. Every state legislature has authorized the compounding of drugs, and state governments continue to regulate the practice.

On September 27, 2004, Plaintiffs filed the instant lawsuit challenging the authority of the FDA to regulate compounded drugs and to inspect·state-licensed retail pharmacies under the Act. On January 27, 2005, Defendants filed a Motion to Dismiss, seeking dismissal of the case for failure to state a claim upon which relief can be ·granted. At a hearing on May 23, 2005, this Court denied, without prejudice, Defendants' Motion to Dismiss and both parties engaged in discovery. On February 24, 2006, Plaintiffs' Motion for Leave to File an Amended Complaint was granted. The Amended ·Complaint sought declaratory and injunctive relief on seven counts. Specifically, Plaintiffs requested (1) declaratory judgment under the new drug definitions found in 21 U.S.C. §§ 321(p)(1) and (v)(1), (2) injunctive relief under the new drug definitions, (3) declaratory judgment under the exemption contained in 21 U.S.C. § 374(a)(1), (4) injunctive relief under the exemption contained in 21 U.S.C. § 374(a)(1), (5) declaratory judgment regarding the FDA's policy that compounding from bulk ingredients for non-food· animals is illegal, (6) injunctive relief regarding Compliance Policy Guideline 608.400, and (7) injunctive relief under 21 U.S.C. § 331(f).

Thereafter, on March 31, 2006, Plaintiffs and Defendants filed competing Motions for Summary Judgment. In their Motion for Summary Judgment, Plaintiffs seek:

1. a declaration that drugs compounded by licensed pharmacists are not "new drugs" or "new animal drugs" *per se* under 21 U.S.C. §§ 321(p)(1) and (v)(1);

2. an injunction that prevents the FDA from declaring that compounded drugs are "new drugs" or "new animal drugs" under 21 U.S.C. §§ 321(p)(1) or (v)(1) and therefore subject to the

requirements and prohibitions imposed upon such drugs under the Act;

3. an injunction that prevents the FDA from enforcing its position that compounded drugs are "new drugs" or "new animal drugs" under 21 U.S.C. §§ 321(p)(1) or (v)(1) and therefore subject to the requirements and prohibitions imposed upon such drugs under the Act;

4. a declaration that the FDA is prohibited from compelling inspections that exceed the grounds enunciated in the first sentence of 21 U.S.C. § 374(a)(1) of pharmacies like Plaintiffs that comply with the requirements of 21 U.S.C. § 374(a)(2)(A);

5. an injunction that prevents the FDA from engaging in inspections that exceed the subjects enunciated in the first sentence of 21 U.S.C. § 374(a)(1) of pharmacies that are in good standing with their respective State boards of pharmacy and have met the Exemption Criteria;

6. a declaration that Compliance Policy Guideline 608.400 and the Notice are unenforceable;

7. a declaration that the FDA does not have the authority to declare compounding from bulk ingredients for non-food animals illegal;

8. an injunction that prevents the FDA from enforcing its current Compliance Policy Guideline which unilaterally declares that compounding from bulk ingredients for non-food animals is illegal;

9. an order requiring the FDA to rescind the Notice at issue in this case;

10. an order requiring the FDA to publish a copy of the Court's order on its website;

11. an injunction that prevents the FDA from prohibiting Plaintiffs or similarly situated pharmacies from receiving bulk ingredients;

12. an injunction that prevents the FDA from bringing prosecutorial, enforcement or punitive actions against any Plaintiffs for refusing to allow the FDA to conduct inspections exceeding the first sentence of 21 U.S.C. § 374(a)(1) of their pharmacies, pursuant to 21 U.S.C. § 374(a)(2)(A), absent independent evidence from the relevant State boards of pharmacy that Plaintiffs are non-compliant; and

13. any and all other relief, in law or in equity, as may be just.

Plaintiffs filed a Response to Defendants' Motion on April 20, 2006, and Defendants' Reply was filed on April 21, 2006. Thereafter on May 25, 2006, this Court held a hearing over the Motions for Summary Judgment. At the conclusion of the hearing, the Court orally granted Plaintiffs' Motion for Summary Judgment in part, and took several remaining issues under advisement. After the hearing, both parties filed supplemental briefs, which this Court has duly considered.

## STANDARD OF REVIEW

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In this case, Plaintiffs and Defendants represent to the Court that no genuine issues of material fact exist. They both filed Motions for Summary Judgment and agree that adjudication based on the summary judgment motions is proper.

## DISCUSSION

In their Motion for Summary Judgment, Plaintiffs argue they are entitled to declaratory and injunctive relief on several grounds, as enumerated above. The Court

finds that the requested relief can be grouped into the following topics: (1) Compounded Drugs, (2) Inspections, (3) Compounding from Bulk Ingredients for Non–Food Animals, (4) Compliance Policy Guideline 608.400 and the Notice, and (5) Injunctions. Each topic shall be examined individually below.

### (1) Compounded Drugs

■ Plaintiffs first contend that compounded drugs, prepared by pharmacists in the regular course of their business pursuant to a prescription from a licensed practitioner are not new drugs under the Act. However, Defendants maintain that compounded drugs fall within the definitions of new drugs found at 21 U.S.C. §§ 321(p)(1) and (v)(1).[1] The new drug definitions state:

"(p) The term "new drug" means -

(1) Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof..."

21 U.S.C. § 321(p)(1).

"(v) The term "new animal drug" means any drug intended for use for animals other than man, including any drug intended for use in animal feed but not including such animal feed, -

(1) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof..."

21 U.S.C. § 321(v)(1). Taken alone, the new drug definitions might seem to indicate that compound drugs fall within their provisions. However, after examining relevant case and statutory law, as well as legislative intent, this Court finds that compound drugs are implicitly exempt from the new drug definitions contained in § 321.

#### a. 21 U.S.C. § 353a

In 1997, Congress enacted the Food and Drug Administration Modernization Act of 1997 ("FDAMA"). In doing so, § 127(a) of FDAMA was codified and added to the Act under 21 U.S.C. § 353a. At the time it was enacted, Section 353a declared:

"(a) In general

Sections 351(a)(2)(B), 352(f)(1), and 355 of this title shall not apply to a drug product if the drug product is compounded for an identified individual patient based on the unsolicited re-

---

1. When reviewing an agency's interpretation of a statute, a court should look to the plain language of the statute and determine whether the agency construction conflicts with the text. *Supreme Beef Processors, Inc. v. United States Dept. of Ag.,* 275 F.3d 432, 438 (5th Cir.2001) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Then, "[i]f the agency interpretation is not in conflict with the plain language of the statute, deference is due." *Id.* Additionally, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron U.S.A.,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778. This Court has afforded the appropriate deference to the FDA's interpretation of the statutory provisions at issue in this case. For the reasons contained in this Order, however, this Court rejects the FDA's construction of those statutes.

ceipt of a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is necessary for the identified patient, if the drug product meets the requirements of this section, and if the compounding -

(1) is by -

 (A) a licensed pharmacist in a State licensed pharmacy or a Federal facility, or

 (B) a licensed physician,

on the prescription order for such individual patient made by a licensed physician or other licensed practitioner authorized by State law to prescribe drugs; or

(2) (A) is by a licensed pharmacist or licensed physician in limited quantities before the receipt of a valid prescription order for such individual patient; and

 (B) is based on a history of the licensed pharmacist or licensed physician receiving valid prescription orders for the compounding of the drug product, which orders have been generated solely within an established relationship between -

 (i) the licensed pharmacist or licensed physician; and

 (ii) (I) such individual patient for whom the prescription order will be provided; or

 (II) the physician or other licensed practitioner who will write such prescription order.

(b) Compounded drug

(1) Licensed pharmacist and licensed physician

A drug product may be compounded under subsection (a) of this section if the licensed pharmacist or licensed physician -

(A) compounds the drug product using bulk drug substances, as defined in regulations of the Secretary published at section 207.3(a)(4) of Title 21 of the Code of Federal Regulations -

(i) that -

(I) comply with the standards of an applicable United States Pharmacopoeia or National Formulary monograph, if a monograph exists, and the United States Pharmacopoeia chapter on pharmacy compounding;

(II) if such a monograph does not exist, are drug substances that are components of drugs approved by the Secretary; or

(III) if such a monograph does not exist and the drug substance is not a component of a drug approved by the Secretary, that appear on a list developed by the Secretary through regulations issued by the Secretary under subsection (d) of this section;

(ii) that are manufactured by an establishment that is registered under section 360 of this title (including a foreign establishment that is registered under section 360(I) of this title); and

(iii) that are accompanied by valid certificates of analysis for each bulk drug substance;

(B) compounds the drug product using ingredients (other than bulk drug substances) that comply with the standards of an applicable United States Pharmacopoeia or National Formulary monograph, if a monograph exists, and the United States Pharmacopoeia chapter on pharmacy compounding;

(C) does not compound a drug product that appears on a list published by the Secretary in the Fed-

eral Register of drug products that have been withdrawn or removed from the market because such drug products or components of such drug products have been found to be unsafe or not effective; and

(D) does not compound regularly or in inordinate amounts (as defined by the Secretary) any drug products that are essentially copies of a commercially available drug product.

(2) Definition

For purposes of paragraph (1)(D), the term "essentially a copy of a commercially available drug product" does not include a drug product in which there is a change, made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product.

(3) Drug product

A drug product may be compounded under subsection (a) only if –

(A) such drug product is not a drug product identified by the Secretary by regulation as a drug product that presents demonstrable difficulties for compounding that reasonably demonstrate an adverse effect on the safety or effectiveness of that drug product; and

(B) such drug product is compounded in a State –

(i) that has entered into a memorandum of understanding with the Secretary which addresses the distribution of inordinate amounts of compounded drug products interstate and provides for appropriate investigation by a State agency of complaints relating to compounded drug products distributed outside such State; or

(ii) that has not entered into the memorandum of understanding described in clause (I) and the licensed pharmacist, licensed pharmacy, or licensed physician distributes (or causes to be distributed) compounded drug products out of the State in which they are compounded in quantities that do not exceed 5 percent of the total prescription orders dispensed or distributed by such pharmacy or physician.

The Secretary shall, in consultation with the National Association of Boards of Pharmacy, develop a standard memorandum of understanding for use by the States in complying with subparagraph (B)(I).

(c) Advertising and promotion

A drug may be compounded under subsection (a) of this section only if the pharmacy, licensed pharmacist, or licensed physician does not advertise or promote the compounding of any particular drug, class of drug, or type of drug. The pharmacy, licensed pharmacist, or licensed physician may advertise and promote the compounding service provided by the licensed pharmacist or licensed physician.

(d) Regulations

(1) In general

The Secretary shall issue regulations to implement this section. Before issuing regulations to implement subsections (b)(1)(A)(i)(III), (b)(1)(C), or (b)(3)(A) of this section, the Secretary shall convene and consult an advisory committee on compounding unless the Secretary determines that the issuance of such regulations before consultation is necessary to protect the public health. The advisory committee shall include representatives from

the National Association of Boards of Pharmacy, the United States Pharmacopoeia, pharmacy, physician, and consumer organizations, and other experts selected by the Secretary.

(2) Limiting compounding

The Secretary, in consultation with the United States Pharmacopoeia Convention, Incorporated, shall promulgate regulations identifying drug substances that may be used in compounding under subsection (b)(1)(A)(i)(III) of this section for which a monograph does not exist or which are not components of drug products approved by the Secretary. The Secretary shall include in the regulation the criteria for such substances, which shall include historical use, reports in peer reviewed medical literature, or other criteria the Secretary may identify.

(e) Application

This section shall not apply to -

(1) compounded positron emission tomography drugs as defined in section 321(ii) of this title; or

(2) radiopharmaceuticals.

(f) "Compounding" defined

As used in this section, the term "compounding" does not include mixing, reconstituting, or other such acts that are performed in accordance with directions contained in approved labeling provided by the product's manufacturer and other manufacturer directions consistent with that labeling."

■ Thus, when enacted, § 353a exempted compounded drugs from the FDA's drug approval process, provided that drug compounders complied with various restrictions. These restrictions included refraining from advertising or promoting certain compounded drugs. *See* 21 U.S.C. §§ 353a(a), (c). After the passage of FDAMA, a group of pharmacies that specialized in compounding filed suit, complaining that the provisions of § 353a that restricted advertising and solicitation violated the free speech guarantee provided by the First Amendment to the United States Constitution. *See W. States Med. Ctr. v. Shalala,* 69 F.Supp.2d 1288 (D.Nev. 1999). The District Court for the District of Nevada found that the relevant provisions did violate the First Amendment, however it severed the remaining portions of the statute. *Id.* On appeal, the Ninth Circuit Court of Appeals affirmed in part and reversed in part, holding that the advertisement and solicitation provisions were unconstitutional, but they were not severable from the remainder of the section. *See W. States Med. Ctr. v. Shalala,* 238 F.3d 1090 (9th Cir.2001). The United States Supreme Court then granted certiorari, however it only reviewed the free speech issue of the case as the severability issue was not raised before it. *See Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002).

Upon review of the case, the Supreme Court found that subsections (a) and (c) of § 353a did violate the free speech guarantee of the Constitution of the United States. *Id.* However, the Court unequivocally stated that it was not reviewing the Court of Appeals' conclusion regarding severability. *See* 535 U.S. at 360, 122 S.Ct. 1497 ("We therefore only address the constitutional question, having no occasion to review the Court of Appeals' severability determination"); *Id.* at 366, 122 S.Ct. 1497 ("Because neither party petitioned for certiorari on the severability issue, we have no occasion to review that portion of the Court of Appeals' decision"). Moreover, the majority's concluding sentence of the opinion declared "we affirm the Court of Appeals' judgment that the speech-related provisions of FDAMA § 127(a) are unconstitutional." *Id.* at 377, 122 S.Ct. 1497. The holding of the Supreme Court

was limited to adjudging §§ 353a(a) and (c) unconstitutional, and the issue of whether the remainder of the statute was severable was not considered. Thus, the last court to rule on the severability issue was the Ninth Circuit Court of Appeals.

Although the Ninth Circuit ruled that the remaining portions of § 353a were not severable from the provisions regarding solicitation and advertising, this Court is not bound by that determination as "the Fifth Circuit is in no way bound by decisions rendered by other circuits." *United States v. Dawson,* 576 F.2d 656, 659 (5th Cir.1978). Rather, the opinions of sister circuits are only considered persuasive authority. *Id.* Additionally, this Court is not alone in recognizing that § 353a has not been declared invalid in its entirety by the Supreme Court. *See United States v. Livdahl,* 2005 WL 3970828 at *8 n. 4 (S.D.Fla.2005) ("This Circuit has not addressed the issue of whether § 353a is invalid in its entirety based on the unconstitutionality of §§ 353a(a) and (c)"). Therefore, because this Court is not bound by the Ninth Circuit's ruling on severability, it shall now consider whether the remaining provisions of § 353a are still intact.

■ It is well established that "a court should refrain from invalidating more of the statute than is necessary." *Regan v. Time, Inc.,* 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)(plurality opinion). If a statute contains provisions that are severable from the unconstitutional portions, a court shall maintain the statute "so far as it is valid." *Id.* When determining if a statute is severable, a court shall examine the statute to see if the constitutionally permissible portions are "fully operative as a law." *I.N.S. v. Chadha,* 462 U.S. 919, 934, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). If the permissible portions are fully operative as law, any offending portions should be severed "[u]nless it is evi-

dent that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." *Id.* In making this determination, a court shall evaluate "whether the statute will function in a *manner* consistent with the intent of Congress." *Alaska Airlines v. Brock,* 480 U.S. 678, 685, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987). Therefore, a court may invalidate an entire statute only if the remaining portions of the statute cannot operate independently or there is clear evidence that Congress would not have enacted the statute without the portions that have been declared unconstitutional.

However, if Congress has explicitly provided for severance through the inclusion of a severability clause, "the inquiry is eased." *Id.* at 686, 107 S.Ct. 1476. The inclusion of a severability clause "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Id.* (citations omitted). "This presumption may be overcome only by 'strong evidence' that Congress would not have enacted the law without the invalidated portions of the statute." *Koog v. United States,* 79 F.3d 452, 462 (5th Cir.1996) (citing *Alaska Airlines,* 480 U.S. at 686, 107 S.Ct. 1476).

In the Act, Congress included a severability clause which clearly dictates the course of action should part of a statute contained therein be declared unconstitutional. Found in § 391, the severability clause states: "[i]f any provision of this chapter is declared unconstitutional, or the applicability thereof to any person or circumstances is held invalid, the constitutionality of the remainder of the chapter and the applicability thereof to other persons and circumstances shall not be affected thereby." *See* 21 U.S.C. § 391. The existence of this clause creates a presumption that Congress intended the rest of a

provision contained within the Act would remain valid if a portion was declared unconstitutional.

■ In making its determination, the Ninth Circuit relied heavily on the legislative history attached to the passage of FDAMA. However, in the Fifth Circuit, a court "cannot search legislative history for congressional intent unless [it finds] the statute unclear or ambiguous." *In re Abbott Labs.*, 51 F.3d 524, 528 (5th Cir.1995); *see also United States v. Missouri Pac. R.R. Co.*, 278 U.S. 269, 278, 49 S.Ct. 133, 73 L.Ed. 322 (1929) ("[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended."). In this case, the language of the severability statute contained in the Act is clear and unambiguous. Therefore, the Court finds that the severability statute must be given its full effect. The offending portions of § 353a are severed and the remainder of the statute remains in full effect.[2]

After subsection (a) and (c) of § 353a are severed, the remaining provisions of the section demonstrate that Congress intended to declare that compounding is an approved and legal practice. The existence of the remaining portions of the statute permit pharmacies to compound drugs. Because pharmacies are permitted to compound, this Court finds that any drugs created by the compounding process are authorized under § 353a and are therefore implicitly exempt from the new drug approval process and the definitions found in 21 U.S.C. § 321(p)(1) and (v)(1).

However, the Court notes that the FDA has raised valid concerns regarding pharmacies that claim to be compounding but in actuality are manufacturing drugs. Thus, pursuant to guidance from the FDA found in Compliance Policy Guideline 460.200, discussed in more detail *infra,* the Court finds that the exemption for compounded drugs from the new drug definition is limited to compounds which are made in reasonable quantities upon receipt of a valid prescription for an individual patient from a licensed practitioner. Drugs that are compounded in large quantities before a prescription is received from a doctor do not fall within the narrow exemption this Court finds exists.

b. *Western States*

Although this Court has not been presented with a single case which explicitly declares that compounding is either legal or prohibited, the Supreme Court recognized the practice of compounding in *Western States*. Therein, the Court outlined the history of compounding and acknowledged the importance of the process. Specifically, the Court stated:

"The Government also has an important interest, however, in permitting the continuation of the practice of compounding so that patients with particular needs may obtain medications suited to those needs. And it would not make sense to require compounded drugs created to meet the unique needs of patients to undergo the testing required for the new drug approval process. Pharmacists do not make enough money from small-scale compounding to make safety and efficacy testing of their compounded drugs economically feasible, so *requir-*

---

**2.** Even assuming *arguendo* that the severability provision in the Act does not control in this case, the Court finds after reviewing the relevant legislative history that its decision would not be altered. The legislative history tied to the passage of § 353a does not overcome the presumption of severability that is created through the existence of the severability clause.

*ing such testing would force pharmacists to stop providing compounded drugs.*"

*W. States*, 535 U.S. at 369–70, 122 S.Ct. 1497 (emphasis added). The language of this case expresses the Supreme Court's acknowledgment of the importance of compounding and the reasons why it is not practical for compounded drugs to be subject to the new drug approval process.

The Court finds that the language of *Western States* demonstrates that compounding is a process that has been approved by the Supreme Court, albeit in dicta. Further, this Court finds that if compounding is a legal activity, then any drugs created through the compounding process must be exempt from the new drug definitions found in the Act. If compounded drugs are not exempt, the drugs would be required to undergo the new drug approval process, which as recognized by the Supreme Court in *Western States*, is not a viable option for compounded drugs.

### c. Compliance Policy Guideline 460.200

After the Supreme Court's decision in *Western States*, the FDA issued a revised Compliance Policy Guideline ("CPG") that governed compounding and pharmacies. *See* CPG 460.200. Although CPG 460.200 is more specific than FDAMA, they contain similar provisions. *Wedgewood Village Pharmacy, Inc. v. United States*, 421 F.3d 263, 272 (3rd Cir.2005). In the CPG, the FDA reiterates its long-standing position that it would not attempt to regulate traditional compounding practices. *See* CPG 460.200. Specifically, the CPG states the "FDA recognizes that pharmacists traditionally have extemporaneously compounded and manipulated reasonable quantities of human drugs upon receipt of a valid prescription for an individually identified patient from a licensed practitioner." *Id.* The CPG further states that this traditional compounding activity is not the subject

of this guidance. *Id.* Rather, the CPG focuses on the regulation of pharmacies who manufacture drugs under the guise of compounding. *Id.* Pursuant to the CPG, the FDA shall consider nine different factors in deciding whether an enforcement action is appropriate for a pharmacy that claims it is compounding, but is actually manufacturing. *Id.* The language in CPG 460.200 demonstrates that the FDA draws a line between compounding for an individual patient pursuant to a prescription from a licensed practitioner and compounding that rises to the level of manufacturing. The Court finds this distinction further supports the exemption of compounded drugs from the new drug definitions, if the drugs are created for an individual patient on the basis of a prescription from a licensed practitioner.

### d. 21 U.S.C. § 374

Another factor supporting the exemption of drugs that are compounded for an individual patient pursuant to a licensed practitioner's prescription is found in the Act under § 374. Section 374, examined in greater detail *infra*, provides the FDA with authority to inspect pharmacies to insure they are complying with the law. *See* 21 U.S.C. § 374. However, there is an explicit exemption from the inspection of all materials found in a pharmacy if the pharmacy is in compliance with local laws, dispensing drugs pursuant to a prescription from a licensed practitioner in the course of his or her professional practice, and compounding in the regular course of its business. *Id.* The Court finds this freedom from inspections of all materials for pharmacies that compound in the regular course of business demonstrates Congress' intent to carve out a niche for compounded drugs.

### e. Public Policy

Finally, public policy supports exempting compounded drugs from the new drug

definitions. If compounded drugs were required to undergo the new drug approval process, the result would be that patients needing individually tailored prescriptions would not be able to receive the necessary medication due to the cost and time associated with obtaining approval. When a licensed practitioner writes a prescription for a compounded drug for a patient, the medication is normally needed soon thereafter. It is not feasible, either economically or time-wise, for the needed medications to be subjected to the FDA approval process. It is in the best interest of public health to recognize an exemption for compounded drugs that are created based on a prescription written for an individual patient by a licensed practitioner.

### f. Conclusion

In conclusion, this Court finds that compounded drugs, when created for an individual patient pursuant to a prescription from a licensed practitioner, are implicitly exempt from the new drug definitions contained in 21 U.S.C. §§ 321(p)(1) and (v)(1). Plaintiff's Motion for Summary Judgment is granted on its claim that compounded drugs do not fall under the new drug definitions.

### (2) Inspections

■ Plaintiffs next contend that they, as pharmacies who comply with 21 U.S.C. § 374(a)(2)(A), are exempt from inspections that exceed what is permitted by 21 U.S.C. § 374(a)(1). Further, they request the FDA be banned from bringing prosecutorial, enforcement or punitive actions against any Plaintiff for refusing to allow the FDA to conduct an inspection that exceeds the first sentence of 21 U.S.C. § 374(a)(1). In response, Defendants argue that the Act unequivocally authorizes the FDA to inspect pharmacies.

Section 374(a) of the Act provides that:

"officers or employees designated by the Secretary. . . . are authorized to enter, at reasonable times, any factory, warehouse, or establishment in which food, drugs, devices, or cosmetics are manufactured, processed, packed, or held, for introduction into interstate commerce or after such introduction, or to enter any vehicle being used to transport or hold such food, drugs, devices, or cosmetics in interstate commerce; . . . and to inspect, at reasonable times and within reasonable limits and in a reasonable manner, such factory, warehouse, establishment. . . . and all pertinent equipment, finished and unfinished materials, containers, and labeling therein."

*See* 21 U.S.C. § 374(a)(1). Additionally, the section provides:

"[i]n the case of any factory, warehouse, establishment, or consulting laboratory in which prescription drugs, nonprescription drugs intended for human use, or restricted devices are manufactured, processed, packed, or held, the inspection shall extend to all things therein (including records, files, papers, processes, controls, and facilities) bearing on whether prescription drugs, nonprescription drugs intended for human use, or restricted devices which are adulterated or misbranded within the meaning of this chapter, or which may not be manufactured, introduced into interstate commerce, or sold, or offered for sale by reason of any provision of this chapter, have been or are being manufactured, processed, packed, transported, or held in any such place, or otherwise bearing on violation of this chapter."

*Id.* This additional inspection authority is often referred to as the "records provision." *Wedgewood Vill. Pharmacy, Inc.*, 421 F.3d at 269. The records provision authorizes the FDA to search not just records, but any files, papers, processes,

controls or facilities if a pharmacy is engaging in certain designated activities. *Id.* However, Congress has specifically exempted certain pharmacies from the enhanced inspection authority contained within the records provision. *Id.* The exemption provides:

"(2) The provisions of the third sentence of paragraph (1) [the records provision] shall not apply to -

(A) pharmacies which maintain establishments in conformance with any applicable local laws regulating the practice of pharmacy and medicine and which are regularly engaged in dispensing prescription drugs or devices, upon prescriptions of practitioners licensed to administer such drugs or devices to patients under the care of such practitioners in the course of their professional practice, and which do not, either through a subsidiary or otherwise, manufacture, prepare, propagate, compound, or process drugs or devices for sale other than in the regular course of their business of dispensing or selling drugs or devices at retail..."

*Id.* § 374(a)(2).

The first sentence of § 374 provides the FDA with a general inspection authority, while the records provision found in the third sentence allows the FDA to engage in enhanced inspections when pharmacies are adulterating or misbranding drugs or restricted devices or otherwise violating the Act. Congress created an exemption from the records provision, though, for pharmacies that (1) conform to applicable local laws that regulate pharmacy, (2) are regularly engaged in dispensing drugs or devices upon receipt of a prescription from a licensed practitioner in the course of his or her practice, and (3) only manufacture,

prepare, propagate, *compound,* or process drugs or devices in the regular course of their business of dispensing or selling drugs at retail. *See id.* (emphasis added).

Pursuant to the language of § 374, the FDA has the authority to conduct limited inspections of all pertinent equipment, finished and unfinished materials, containers, and labeling found in pharmacies. However, if a pharmacy is compliant with local laws, and dispenses drugs pursuant to the receipt of a prescription from a licensed practitioner, and compounds in the regular course of its own individualized business, the pharmacy is exempt from the more detailed inspection of the records found in the third sentence of the section. In order to conduct a third sentence inspection of a pharmacy who meets the requirements found in the exemption, the FDA must demonstrate why the pharmacy does not qualify for the exemption.

In this case, the FDA has not demonstrated that any of the ten Plaintiff pharmacies do not qualify for the exemption. Rather, the evidence before the Court establishes that Plaintiff pharmacies all conform with the applicable local laws, dispense drugs pursuant to prescriptions from licensed practitioners and compound drugs in the regular course of their business. Because Plaintiff pharmacies meet the requirements of the exemption, the FDA cannot conduct inspections that exceed the authority granted in the first sentence of 21 U.S.C. § 374. In other words, the FDA is not authorized to carry out the more intrusive records inspection against Plaintiffs unless it demonstrates that they are no longer meeting the requirements set forth in the exemption.[3] Additionally, as long as the pharmacies

---

**3.** In making this ruling, the Court limits its holding to the pharmacies involved as Plaintiffs in this case, who have demonstrated that they each comply with the exemption require-

ments. The ruling does not extend to pharmacies who have not shown they meet the exemption.

involved in this case as Plaintiffs continue to meet the requirements of the exemption, the FDA shall not bring prosecutorial, enforcement or punitive actions against them for refusing to allow the FDA to conduct an inspection that exceeds the first sentence of 21 U.S.C. § 374(a)(1). Accordingly, Plaintiff's request for a declaration that the FDA is prohibited from compelling inspections that exceed the grounds set forth in the first sentence of 21 U.S.C. § 374(a)(1) of pharmacies that comply with the requirements of 21 U.S.C. § 374(a)(2)(A) is granted only as to the pharmacies who are Plaintiffs in this cause of action.

### (3) Compounding from Bulk Ingredients for Non–Food Animals

■ Plaintiffs maintain that nothing in the Act prohibits them from compounding drugs from bulk ingredients for non-food producing animals. Further, Plaintiffs declare this is an area of regulation for the states. In response, Defendants declare that the use of bulk active pharmaceutical ingredients in the compounding process as it relates to non-food producing animals creates a new drug that is unsafe, adulterated and misbranded under the Act.[4]

#### a. Unsafe and Adulterated Drugs

Defendants first contend that drugs compounded for non-food animals from bulk ingredients are unsafe under 21 U.S.C. § 360b, and hence adulterated under 21 U.S.C. § 351. Section 360b states "[a] new animal drug shall, with respect to any particular use or intended use of such drug, be deemed unsafe for purposes of section 351(a)(5) of this title unless..." certain requirements related to the filing

of a new drug application are met. Section 351(a)(5) declares "[a] drug or device shall be deemed to be adulterated...if it is a new animal drug which is unsafe within the meaning of section 360b of this title."

As this Court declared in the discussion *supra*, compounded drugs do not fall within the new animal drug definition. Because drugs compounded for animal use are not new animal drugs, they do not fall under the provisions of 21 U.S.C. § 360b and thus are not unsafe. Moreover, because animal drugs which have been compounded are not unsafe under 21 U.S.C. § 360b, they are not adulterated under 21 U.S.C. § 351.

#### b. Misbranded Drugs

Next, Defendants declare that drugs compounded from bulk ingredients for non-food animals are prohibited because bulk ingredients are drugs under 21 U.S.C. § 321(g)(1)(D) which are misbranded under 21 U.S.C. § 352. Defendants maintain the drugs are misbranded because they fail to bear adequate directions for use. However, as Defendants recognize in their Motion for Summary Judgment, there is an exemption found in the Regulations relating to the use of bulk ingredients. The regulation found at 21 C.F.R. § 201.122 exempts bulk ingredients from the Act's adequate directions for use requirement unless the finished product is a new drug. This Court found *supra* that drugs compounded for animal use are not new drugs. Thus, 21 C.F.R. § 201.122 exempts the bulk ingredients used in compounding drugs for non-food animals. As such, the Court finds that the Act does not contain a prohibition that prevents the use

4. Initially, Defendants maintained that the Animal Medicinal Drug Use Clarification Act of 1994 ("AMDUCA") prohibited compounding from bulk ingredients for animal drugs. At the summary judgment stage, however, Defendants abandoned this argument. There-

fore, the Court shall not address this issue in depth, other than to recognize that AMDUCA does not prohibit the compounding of animal drugs from bulk-drug ingredients. Rather, AMDUCA permits the extra-label use of certain approved animal drugs.

of bulk ingredients in drugs compounded for non-food animals.

Additionally, the Court finds it should be noted that the misbranding provision found in 21 U.S.C. § 352 does not automatically apply to Plaintiff pharmacies in this case because the evidence demonstrates they are:

> "pharmacies which maintain establishments in conformance with any applicable local laws regulating the practice of pharmacy and medicine and which are regularly engaged in dispensing prescription drugs or devices, upon prescriptions of practitioners licensed to administer such drugs or devices to patients under the care of such practitioners in the course of their professional practice, and which do not manufacture, prepare, propagate, compound, or process drugs or devices for sale other than in the regular course of their business of dispensing or selling drugs or devices at retail..."

21 U.S.C. § 360(g)(1). Because Plaintiff pharmacies are compliant, they are not required to register with the Secretary nor are they automatically subject to the misbranding provision. *See* 21 U.S.C. § 352(*o*).

### c. *Containers* and *Algon*

Finally, the parties debate at length whether the cases of *United States v. 9/1 Kg. Containers*, 854 F.2d 173 (7th Cir. 1988) and *United States v. Algon Chem., Inc.*, 879 F.2d 1154 (3rd Cir.1989) prevent pharmacies that are deemed compliant under 21 U.S.C. § 360(g)(1) from compounding using bulk ingredients. After duly considering both cases, this Court finds that *Containers* and *Algon* are distinguishable from the case now before it. Those cases involved bulk drug suppliers who were providing bulk drugs directly to veterinarians. Suppliers and veterinarians are not afforded the protections that compliant, compounding pharmacies are given

under the Act. As long as compliant pharmacies are compounding drugs for non-food animals with legal bulk ingredients, they comport with the Act. That is the case with Plaintiffs in this case, who are all compliant pharmacies. If, however, pharmacies use illegal bulk ingredients when compounding for non-food animals, they lose the protections afforded by the Act and are subject to enforcement actions.

### d. Conclusion

In conclusion, this Court finds that pharmacies may compound drugs for non-food animals from legal bulk ingredients. Drugs compounded from legal bulk ingredients do not violate the Act's unsafe, adulterated or misbranded provisions. Plaintiffs' Motion for Summary Judgment is accordingly granted on this claim.

### (4) Compliance Policy Guideline 608.400 and the Notice

Plaintiffs assert that the CPG and Notice at issue in this case misstate the law and violate the Administrative Procedures Act. To the contrary, Defendants contend that the CPG and the Notice are not substantive rules and therefore do not require notice and comment rulemaking. The specific CPG about which Plaintiffs complain in this case is CPG 608.400. CPG 608.400 prohibits the compounding of drugs for non-food animals from bulk ingredients. The Notice at issue was sent on April 2, 2004, to all United States Boards of Pharmacy from the Director of the Office of Compliance for the FDA Center for Veterinary Medicine. The Notice declared that pharmacy compounding from bulk ingredients for non-food animals is illegal.

 The Administrative Procedures Act requires that substantive or legislative rules, which have the force and effect of law, are subject to the APA's notice-and-comment rulemaking requirements. *See* 5

U.S.C. § 553(b). Exempt from the notice-and-comment requirements are "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(3)(b)(A). However, "if a rule is 'substantive,' the exemption is inapplicable, and the full panoply of notice-and-comment requirements must be adhered to scrupulously. The 'APA's notice and comment exemptions must be narrowly construed.'" *Prof'ls and Patients for Customized Care v. Shalala,* 56 F.3d 592, 595 (5th Cir.1995). Courts of the Fifth Circuit have long recognized that CPG's are not substantive rules, and thus are exempt from the notice-and-comment requirements. *See Prof'ls and Patients for Customized Care; Se. Minerals, Inc. v. Harris,* 622 F.2d 758 (5th Cir.1980); and *Cowdin v. Young,* 681 F.Supp. 366, 370 (W.D.La.1987).

After careful consideration of CPG 608.400 and the Notice, this Court finds that they are not substantive rules. The CPG clearly states that it is not binding on the FDA or the public, and that it merely reflects the FDA's current thinking on what might be subject to an enforcement action. Similarly, the Notice was issued to the States as a request for assistance with potential FDA inspections of pharmacies. The Court finds that neither of these documents contain new substantive rules, and thus neither were subject to the APA's notice-and-comment procedures.

However, despite the fact that CPG 608.400 and the Notice were not subject to notice-and-comment, and therefore will neither will be stricken, the Court finds that they do not fully comport with the instant Order. To the extent that they contradict the rulings contained herein, the FDA shall no longer be permitted to enforce those portions of CPG 608.400 and the Notice. The balance of the CPG and the Notice shall remain in effect. Thus, the Defendants' Motion for Summary Judgment is granted in part, as the Court finds the CPG and Notice were not subject to the APA's notice-and-comment procedures. Plaintiffs' Motion for Summary Judgment is granted in part, as the Defendants shall no longer be permitted to enforce the portions of the CPG and Notice which conflict with the instant Order.

**(5) Injunctions**

■ Plaintiffs have requested injunctions against Defendants to prevent them from (1) declaring that compounded drugs are new drugs or new animal drugs, (2) engaging in inspections that exceed the subjects enunciated in the first sentence of 21 U.S.C. § 374(a)(1) of pharmacies that are in good standing with their respective State boards of pharmacy and have met the Exemption Criteria, (3) enforcing its current Compliance Policy Guideline which unilaterally declares that compounding from bulk ingredients for non-food animals is illegal, (4) prohibiting Plaintiffs or similarly situated pharmacies from receiving bulk ingredients, and (5) bringing prosecutorial, enforcement or punitive actions against any Plaintiffs for refusing to allow the FDA to conduct inspections exceeding the first sentence of 21 U.S.C. § 374(a)(1) of their pharmacies, pursuant to 21 U.S.C. § 374(a)(2)(A), absent independent evidence from the relevant State boards of pharmacy that Plaintiffs are non-compliant. Defendants, in response, argue that there is no legal or factual basis to support the entering of any injunction in this case.

At this time, the Court finds that it is not appropriate to enter injunctions that would amount to pre-enforcement review of FDA actions. *See Southeastern Minerals, Inc. v. Harris,* 622 F.2d 758 (5th Cir. 1980). However, the parties are advised that Plaintiffs' requests for injunctions are denied without prejudice. If in the future Defendants continue to violate the Act,

Plaintiffs may re-urge their requests for injunctions and the Court shall consider the petition at that time. Therefore, Plaintiffs' requests for an injunction, contained within their Motion for Summary Judgment, is denied without prejudice. Defendants' request that the injunctions be denied is granted, with the caveat that Plaintiffs shall be permitted to resubmit their requests for injunctions if Defendants continue to violate the Act.

## CONCLUSION

Based on the above-stated reasoning, Plaintiffs' Motion for Summary Judgment is granted in part and denied in part, and Defendants' Motion for Summary Judgment is granted in part and denied in part. Accordingly,

It is **HEREBY ORDERED** that Plaintiffs' Motion Summary Judgment is **GRANTED IN PART.**

It is **FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED IN PART**, in that the requests for injunctions are denied without prejudice.

It is **FURTHER ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**